## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| JENNIFER JUBINVILLE, JENNA SPRENGEL, KELLI COPPI, and LAURA FREEMAN, on behalf of themselves and all others similarly situated, | Case No. _____ |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| HILL'S PET NUTRITION, INC., and HILL'S PET NUTRITION SALES INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Jennifer Jubinville, Jenna Sprengel, Kelli Coppi, and Laura Freeman, bring this action, individually and on behalf of all others similarly situated, against Hill's Pet Nutrition, Inc. and Hill's Pet Nutrition Sales, Inc. (together, "Hill's" or "Defendant"), and John Does 1-10, and allege as follows:

## SUMMARY OF THE ACTION

1.      Hill's manufactures, markets, warrants, and sells Hill's Prescription Diet ("Prescription Diet") and Hill's Science Diet ("Science Diet") dog foods (collectively, the "Specialty Dog Foods").  These foods are specially formulated for the specific health needs of certain dogs.  In marketing materials and packaging for the Specialty Dog Foods, Hill's says it is providing "[n]utrition that can transform the lives of pets and comfort the pet parents and vets who care for them," and claims that "differences you can see, feel & trust" all "start with science."

2.      Contrary to Hill's representations, however, Hill's has manufactured, sold, and warranted Specialty Dog Foods containing toxic and often fatal levels of vitamin D.

3.      Excessive vitamin D poses substantial and unreasonable risks to dogs. As Hill's

1

itself recognized in recalling a subset of its Specialty Dog Foods, "elevated levels of vitamin D" can cause symptoms such as "vomiting, loss of appetite, increased thirst, increased urination, excessive drooling, and weight loss," and can lead to "serious health issues in dogs including renal dysfunction."[1]

4.     Many dog owners have witnessed their dogs suffer as a result of consuming the Specialty Dog Foods.  The dogs have required expensive veterinary treatment, and many of them have died, resulting in additional suffering, and costs, to their owners.

5.     Not only has Hill's sold contaminated food, but it has dragged its feet in issuing a recall and including all contaminated food within the scope of the recall.  Hill's failure to promptly recall *every* contaminated product sold under the Prescription Diet and Science Diet lines is particularly egregious because it knew or should have known that these products contained toxic levels of vitamin D.  Not only does Hill's claim to subject its suppliers, raw materials, and finished products to extensive and repeated quality testing,[2] but vitamin D toxicity was a known risk much earlier than January 31, 2019 when Hill's first announced its recall:  in December of 2018 several other brands of dog food were recalled due to toxic levels of vitamin D found in those products, and dogs eating Hill's Specialty Dog Foods began dying of vitamin D toxicity well before that.

6.     The lethal nature of Hill's Specialty Dog Foods has been compounded by Hill's excessive and unwarranted delay in warning consumers and regulatory agencies of the dangers posed by those products and has caused untold numbers of pet owners significant emotional distress and financial loss.

7.     Accordingly, Plaintiffs bring this class action on behalf of themselves and all other similarly situated consumers.  Plaintiffs seek, *inter alia*, monetary relief and an order forcing Hill's

---

[1] https://www.hillspet.com/productlist (last visited February 14, 2019).
[2] https://www.hillspet.com/about-us/quality-and-safety (last visited February 14, 2019).

to provide appropriate injunctive relief by ensuring that *all* potentially affected products are identified on Hill's website and removed from shelves and that the public is adequately notified that they should not purchase and should immediately stop using the tainted food, and their dogs should be taken to a veterinarian for testing and whatever treatment is necessary.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because there are 100 or more class members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there is minimal diversity because Plaintiffs and Defendants are citizens of different states.   The Court also has federal question jurisdiction based on the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et. seq.*, and supplemental jurisdiction over state and common law claims based on 28 U.S.C. § 1367(a).

9.     The Court has personal jurisdiction over Defendant because it regularly conducts a substantial amount of business in this District, and intentionally and purposefully places the Specialty Dog Foods into the stream of commerce within the District of Rhode Island and throughout the United States.  Defendant's wrongful conduct, as alleged herein, was carried out in Rhode Island and elsewhere throughout the United States.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant transacts business and advertises in this District and has received substantial revenue and profits from the sale of the Specialty Dog Foods in this District, including from sales to Plaintiff Jubinville and other members of the Class.  Plaintiff Jubinville's dog also consumed the Specialty Dog Food and subsequently received veterinary care in this District.  Therefore, a substantial part of the events and/or omissions giving rise to Plaintiffs' claims occurred within this District.

## PARTIES

11.     Plaintiff Jennifer Jubinville is a citizen of the state of Rhode Island and currently resides in Cranston, Rhode Island.

12.     Plaintiff Jenna Sprengel is a citizen of the state of Illinois and currently resides in St. Charles, Illinois.

13.     Plaintiff Kelli Coppi is a citizen of the state of New York and currently resides in Brooklyn, New York.

14.     Plaintiff Laura Freeman is a citizen of the state of Texas and currently resides in Katy, Texas.

15.     Defendants Hill's Pet Nutrition, Inc. is a Delaware corporation, with its principal place of business in Kansas.  Defendant Hill's Pet Nutrition Sales, Inc. is authorized by the New York Secretary of State to do business within the State of New York.

## COMMON FACTUAL ALLEGATIONS

**Hill's and its Products**

16.     Hill's manufactures and sells pet food internationally, and is one of the largest suppliers of pet food in North America.

17.     Hill's sells its pet food products, including the Specialty Dog Foods, at veterinary clinics and pet retailers across the United States, including PetSmart and Petco, as well as through online retailers like Amazon and Chewy.  No matter where consumers purchase the Specialty Dog Foods, they are packaged in sealed containers with the same labeling and packaging that is displayed on the Hill's website.[3]

18.     In order to better sell the Specialty Dog Foods, and to entice veterinarians to

---

[3] *See, e.g.,* https://www.hillspet.com/dog-food (last visited February 14, 2019).

prescribe them, Hill's markets the Specialty Dog Foods as formulated and intended for dogs with specific needs or illnesses, such as: age-specific dietary needs, breed-specific dietary needs, digestive issues, heart issues, liver issues, or kidney issues.

19.    Hill's website touts the Specialty Dog Foods' performance properties, claiming that the products "[s]upport[ ] a healthy immune system,"[4] "improve and lengthen quality of life,"[5] "can be used long-term,"[6] "[p]rotect[ ] vital kidney & heart function,"[7] "[s]upport your dog's natural ability to build lean muscle daily,"[8] and "meet[ ] the special nutritional needs of puppies and adult dogs."[9] Hill's repeats these claims on the Specialty Dog Foods' packaging.

20.    Hill's also issues a "100% Satisfaction" money-back guarantee with every Specialty Dog Food purchase.

21.    Based on Hill's money-back guarantee and various affirmations of fact and purportedly "clinically proven" effectiveness, consumers across the country pay a premium for the Specialty Dog Foods, believing they are tailored to the specific needs of their dogs and safe for pet consumption.

22.    Instead, the Specialty Dog Foods that consumers across the country have fed to their pets have proven to be toxic, causing symptoms of renal failures such as dehydration, diarrhea, loss of appetite, increased thirst, lethargy, vomiting, and often death.[10]

---

[4] *See, e.g.*, https://www.hillspet.com/dog-food/pd-id-canine-canned# (last visited February 14, 2019).
[5] *See, e.g.*, https://www.hillspet.com/dog-food/pd-kd-canine-canned (last visited February 14, 2019).
[6] *See, e.g.*, https://www.hillspet.com/dog-food/pd-id-sensitive-canine-dry# (last visited February 14, 2019).
[7] *See, e.g.*, https://www.hillspet.com/dog-food/pd-kd-canine-canned# (last visited February 14, 2019).
[8] *Id.*
[9] *See, e.g.*, https://www.hillspet.com/dog-food/pd-id-canine-chicken-and-vegetable-stew-canned (last visited February 14, 2019).
[10] https://www.nbcchicago.com/news/national-international/Pet-Owners-Say-Their-Dogs-Are-Sick-Dying-After-Eating-Recalled-Hills-Pet-Nutrition-Dog-Food-505379451.html?_osource=SocialFlowFB_CHBrand&fbclid=IwAR1YE1ZUss2ZVHkMlzlwfqLHC9a-saet-TckbfEDEghbUj3mckLYzN (last visited February 14, 2019).

**Vitamin D Toxicity**

23.     For an unknown but discoverable period of time, Hill's has manufactured the Specialty Dog Foods with excessive, toxic, and potentially lethal levels of vitamin D.

24.     Some vitamin D is necessary for dogs because it helps regulate calcium and phosphorous levels, aids bone formation, and promotes nerve and muscle control.

25.     Excess vitamin D, however, can cause vomiting, loss of appetite, increased thirst, increased urination, excessive drooling, weight loss, muscle tremors, cardiac abnormalities, and seizures.

26.     Eventually—and sometimes quite rapidly—consumption of excessive vitamin D can cause kidney failure and death.

**Excessive Vitamin D in Hill's Products and Hill's Knowledge of that Contamination**

27.     The experiences of Plaintiffs and other consumers demonstrate that Hill's Specialty Dog Foods have contained excessive levels of vitamin D levels—and that Hill's has known about that contamination—for some time.

28.     As early as February of 2018,[11] dog owners began to complain that Hill's Specialty Dog Foods were causing their pets to display symptoms consistent with vitamin D poisoning, such as "daily diarrhea, excessive thirst and constant food begging."[12]

29.     Hill's actively monitors the internet for consumer complaints about its products.

30.     As a result of online consumer complaints, Hill's knew or should have known of the elevated vitamin D levels in the Specialty Dog Foods by at least February of 2018.

---

[11] https://www.consumeraffairs.com/pets/hills.html?page=2 (Feb. 25, 2018 review posted by "Carrie") (last visited February 14, 2019).
[12] https://www.consumeraffairs.com/pets/hills.html (May 21, 2018 review posted by "Mandy") (last visited February 14, 2019).

31.     Hill's also claims to have rigorous quality assurance protocols in place, processes that did or should have alerted it to the toxic levels of vitamin D in its raw materials.

32.     Hill's touts its "proven commitment to quality and safety" and claims that it "only accept[s] ingredients from suppliers whose facilities meet stringent quality standards and who are approved by Hill's," and further examines each ingredient "to ensure its safety."

33.     Similarly, Hill's claims that it "conduct[s] annual quality systems audits for all manufacturing facilities to ensure [they] meet the high standards your pet deserves" and "conduct[s] final safety checks daily on every Hill's pet food product to help ensure the safety of your pet's food."

34.     Hill's further claims that "all finished products are physically inspected and tested for key nutrients prior to release to help ensure your pet gets a consistent product bag to bag."

35.     As a result of the quality control procedures it should have and claims to have for it Specialty Dog Foods, Hill's learned, or should have learned, of the excessive and fatal levels of vitamin D before a single can of contaminated Specialty Dog Foods was sold.[13]

36.     Further, at some point prior to December 3, 2018, a pet food manufacturer which had received complaints from pet owners about dogs suffering from vitamin D toxicity informed the FDA that it was recalling several product lines.

37.     The FDA began to test products and concluded that a wide swath of dog foods sold in the United States contained potentially lethal doses of vitamin D:  sometimes as much as 70 times the intended dose.

38.     On December 3, 2018, the FDA issued a press release warning pet owners about potentially toxic levels of vitamin D in several brands of pet food, and noting that it was working

---

[13] https://www.hillspet.com/about-us/quality-and-safety (last visited February 14, 2019).

with a common contract manufacturer of pet food to provide a comprehensive list of affected brands.

39.     The FDA stated that test samples of the dog food contained "excessive, potentially toxic amounts of vitamin D" and warned that excess vitamin D can cause "vomiting, loss of appetite, increased thirst, increased urination, excessive drooling and weight loss," or even "kidney failure and death."

40.     Despite the FDA's public warnings, Hill's continued to manufacture, sell, and warrant its Specialty Dog Foods unabated, to the detriment of consumers and their pets alike, for nearly two months after the press release was issued.

41.     Dog owners have incurred substantial expenses as a result of purchasing the Specialty Dog Foods, including the cost of the food itself, veterinary bills for dogs who have consumed the contaminated products, and even costs associated with cremation and burial of dogs. Some pet owners have accrued thousands of dollars in veterinary bills and related expenses.

**The Recall**

42.     On January 31, 2019, Hill's announced an initial recall of canned Prescription Diet and Science Diet products.  Hill's issued a press release detailing the risk of excessive vitamin D consumption and identifying affected products.[14]

43.     Even though a video message included with the January 31, 2019 recall represented that the SKU and lot numbers identified in the January 31, 2019 recall were "confirmed to be the only affected products in this voluntary canned dog food recall[ ]," on February 7, 2019, Hill's announced an expansion of the recall to include additional SKU and lot numbers of canned

---

[14] https://www.hillspet.com/productlist (last visited February 14, 2019).

Prescription Diet and Science diet products.[15]

44.    To date, Hill's has not identified the cause of the vitamin D toxicity beyond claiming it is "due to a supplier error."

45.    Moreover, Hill's has done little to calm the fears of dog owners concerned about their dogs' health after learning of the recall.  Despite claims that it will be operating for longer hours with an increased number of staff, Hill's has failed to manage the high volume of incoming complaints.  Many class members have been unable to reach Defendant's customer service representatives.

46.    Some consumers who have been able to reach Hill's customer service representatives to report the illness and death of their dogs have been offered only coupons redeemable for future dog food purchases.

47.    Worse, dogs that consumed Hill's products which are not yet part of the recall are exhibiting symptoms of vitamin D toxicity.  Thus, it appears that Hill's has recalled only a subset of its affected Specialty Dog Foods.

48.    Indeed, as of the date of filing, the recall involves about 675,000 cases of canned food, or less than 4 percent of Hill's annual U.S. sales, according to the company.

49.    Accordingly, dog owners will continue to see their beloved pets suffer until Hill's recalls each and every product contaminated by high levels of vitamin D.

### PLAINTIFFS' EXPERIENCES

**Plaintiff Jubinville**

50.    Plaintiff Jubinville fed her dog, Staley, the l/d formula of Hill's Specialty Dog

---

[15] *See, e.g.*, http://www.dvm360.com/hill-s-recall-expanded-pet-owners-demand-answers (last visited February 14, 2019).

Foods from 2016 until the beginning of October, 2018.

51.     In August, 2018, Staley began to react poorly to the food—including through sudden-onset, uncontrolled urination—and Jubinville took Staley to the veterinarian for examination. Staley's behavior was so aberrant that Jubinville asked the veterinarian whether the food could be poisoned.

52.     The veterinarian informed Jubinville that there was no way to check for such poisoning. Staley's blood panels at the time were basically normal, with one kidney testing at very slightly elevated levels.

53.     Jubinville started feeding Staley the k/d and i/d formulations of Hill's Specialty Dog Foods on or about October 1, 2018. Around November 1, Staley started trembling. Jubinville brought her to Tuft's veterinary emergency room for evaluation. Staley's kidney levels had skyrocketed well past normal levels, from 1.9 to 4.

54.     While in Tuft's care, Staley was fed Hill's Specialty Dog Foods that are the current subject of this complaint. In the week she was at Tuft's and being fed these foods, Staley's kidney levels shot up to 8.

55.     When Jubinville checked her dog out of Tuft's emergency facility, Tuft's personnel sent her home with cans of Hill's Specialty Dog Foods with instructions to keep feeding them to Staley.

56.     After approximately ten days, Staley's physical condition had deteriorated further and Jubinville brought her back to her regular veterinarian; Jubinville dropped Staley off at the veterinarian's in the morning and picked her up to take her home at night. The veterinarian and Jubinville continued to feed Staley Hill's Specialty Dog Foods during this period. Eventually, Staley stopped eating voluntarily and had to be force fed.

57.     Within days, Staley had to be euthanized.

58.     Jubinville is devastated by Staley's death.

59.     Jubinville spent thousands of dollars on veterinary bills (including cremation) and doing whatever was possible to save Staley's life.

60.     Jubinville would not have purchased and/or given Staley Hill's Specialty Dog Foods had she known they contained levels of vitamin D that were dangerous to the dog.

**Plaintiff Sprengel**

61.     Plaintiff Sprengel's two dogs, Groucho and Wrigley, both became ill after eating Hill's I/D low-fat canned dog food, one of Hill's Specialty Dog Foods.  The illnesses caused by the dog food have necessitated many trips to the veterinarian, an internal specialist, and a veterinary emergency room.

62.     On January 8, 2019, Groucho had his teeth cleaned and had 12 teeth pulled.  The bloodwork done in advance of the procedure revealed no signs of diabetes or pancreatitis.

63.     Though Sprengel typically fed her dogs Hill's Prescription I/D low-fat dry dog food, she began serving Groucho Hill's Prescription I/D low-fat canned dog food the evening of January 8 given his sore mouth.  Throughout the week of January 21, 2019, Groucho vomited, urinated in the house, was extremely weak and lethargic, and generally seemed ill.  Sprengel took Grouch to the veterinarian, who diagnosed Groucho with pancreatitis.

64.     Not knowing that the Hill's Prescription I/D low-fat canned dog food was making Groucho ill, Sprengel began serving Wrigley the same food the week of January 21, 2019.  Wrigley began experiencing increased thirst and urination.

65.     On January 26, Sprengel took Groucho back to the veterinarian after his symptoms failed to improve.  He was diagnosed with diabetes.

66.    Throughout the week of January 28, 2019, Wrigley became very weak, started eating exceedingly slowly, began vomiting, became lethargic, and had continued increased thirst and urination.

67.    On February 4, 2019, Wrigley was diagnosed with pancreatitis, diabetes, severe kidney problems, and high levels of vitamin D.  Sprengel has been told that nothing more can be done to save the kidney.  Although Wrigley's calcium levels were normal as of November 28, 2018 when he had bloodwork prior to teeth cleaning, his calcium levels are also now dangerously high.  The veterinarian believes this may be from the kidney disease, though further testing is needed for confirmation.

68.    Groucho's triglycerides are dangerously high, and he has sludge in his liver.  The veterinarian does not know the reason for either condition.

69.    The dogs' conditions have required and—should they live—will require expensive ongoing treatment and a special diet for the remainder of their lives.

70.    Sprengel has spent thousands of dollars on veterinary bills and will continue to do so if it is possible to save the lives of Wrigley and Groucho.

71.    Sprengel would not have purchased and/or given Groucho or Wrigley Hill's Specialty Dog Foods had she known they contained levels of vitamin D that were dangerous to the dogs.

**Plaintiff Coppi**

72.    Plaintiff Coppi's dog, Scarlett, ate Hill's Specialty Dog Food for approximately five years.

73.    On or about January 9, 2019, Scarlett stopped eating.  Two weeks earlier, Scarlett had blood work done in advance of a teeth cleaning.  That blood work came back normal.

12

74.     On January 11, Scarlett started vomiting bile.  She also became extremely thirsty and started to drink large amounts of water.

75.     On January 12, Coppi's husband took Scarlett to the veterinarian, who advised Coppi to continue to monitor the dog.  Coppi's husband took Scarlett home, where she started to vomit water.  Scarlett would hover over her water bowl, eventually force herself to drink, and then vomit whatever she was able to get down.

76.     Coppi took Scarlett back to the veterinarian on Monday, January 14.  Since the veterinarian had just performed blood work for the teeth cleaning, he asked if Coppi would mind if he checked it again.  Coppi agreed.

77.     The veterinarian gave Scarlett a laxative, which she ate, but she vomited when Coppi took her home.

78.     The next day, January 15, 2019, the veterinarian called Coppi and told her the blood work came back with blood levels so high that Scarlett was in renal failure and had to be euthanized, which she was.

79.     Coppi spent many hundreds of dollars on veterinary bills (including cremation) and doing whatever was possible to save Scarlett's life.

80.     Coppi would not have purchased and/or given Scarlett Hill's Specialty Dog Foods had she known they contained levels of vitamin D that were dangerous to the dog.

**Plaintiff Freeman**

81.     In October 2018, Plaintiff Freeman's four-year-old dog, Mocha, stopped eating for five days.  Freeman took Mocha to see the veterinarian, who took x-rays and did not see anything unusual; Mocha's bloodwork was normal.  The veterinarian suggested an appetite-increasing medication and recommended Hill's Prescription Diet Food.

82.     Mocha subsequently consumed half a can of Hill's Prescription Diet Food.  The next day, she started drooling excessively and vomiting bile.

83.     Freeman subsequently took Mocha back to the veterinarian.  At that time, the veterinarian thought the issue might be acid reflux and prescribed her medication to treat the suspected issue.  Freeman convinced Mocha to swallow the prescribed medicine by wrapping it in Hill's Prescription Diet Food.  Mocha continued drooling excessively and began drinking a lot.

84.     Freeman and Mocha returned to the veterinarian for an ultrasound and bloodwork. The ultrasound was normal, but Mocha's kidney and liver panels were extremely elevated.

85.     The veterinarian gave Mocha more Hill's Prescription Diet Food.  Later that morning, Mocha was much worse.

86.     Increasingly worried, Freeman took Mocha to a pet emergency room.  After hearing the history and an examination of Mocha, the veterinarian technician asked Freeman if Mocha had gotten into any poison.

87.     Around 9 p.m. that evening, the veterinarian's office called Freeman, told her that Mocha seemed to have stabilized, and informed her that she might be transferred to a regular, non-emergency setting the next day.

88.     The following morning, however, the veterinarian called Freeman and told her that Mocha had suffered a heart attack.  CPR efforts were unsuccessful and Mocha died.

89.     Freeman became aware of Defendant's recall on February 2, 2019.

90.     Freeman and her family are devastated by Mocha's death.

91.     Freeman spent thousands of dollars on veterinary bills (including cremation) and doing whatever was possible to save Mocha's life.

92.     Freeman would not have purchased and/or given Mocha Hill's Prescription Diet

Food had she known it contained levels of vitamin D that were dangerous to the dog.

## CLASS ALLEGATIONS

93.     This action is brought and may be maintained as a class action under Federal Rule

of Civil Procedure 23.

94.     Plaintiffs seek to represent the following Classes:

<u>Nationwide Class</u>: All persons in the United States who purchased Hill's
Prescription Diet or Science Diet dog food with elevated levels of vitamin D;

<u>Rhode Island Subclass</u>: All persons in the state of Rhode Island who purchased
Hill's Prescription Diet and Science Diet dog food with elevated levels of vitamin
D;

<u>Illinois Subclass</u>: All persons in the state of Illinois who purchased Hill's
Prescription Diet or Science Diet dog food with elevated levels of vitamin D;

<u>New York Subclass</u>: All persons in the state of New York who purchased Hill's
Prescription Diet and Science Diet dog food with elevated levels of vitamin D; and

<u>Texas Subclass</u>: All persons in the state of Texas who purchased Hill's
Prescription Diet and Science Diet dog food with elevated levels of vitamin D.

95.     The Nationwide Class and the state Subclasses shall be collectively referred to

herein as the "Class."   Excluded from the Class are: (1) Defendant, and any entity in which

Defendant has a controlling interest or which have a controlling interest in Defendant; (2)

Defendant's legal representatives, assigns, and successors; (3) the judge(s) to whom this case is

assigned, his or her spouse, and members of the judge's staff; and (4) anyone who purchased Hill's

Prescription Diet or Hill's Science Diet canned foods for resale.

96.     Plaintiffs and members of the Class seek relief under Rule 23(b)(2).  The injunctive

relief is a significant reason for bringing this case and, on its own, justifies the prosecution of this

litigation.  Plaintiffs and members of the Class also seek relief under Rule 23(b)(3) and/or (c)(4).

97.     **Numerosity**: Hill's has manufactured and sold the Specialty Dog Foods to tens of

thousands of consumers.  As of the date of filing, Hill's has recalled 675,000 cases—or 13.5 million cans—of Specialty Dog Foods.  Members of the Class are thus too numerous to join in a single action.  Moreover, members of the Class may be identified through retailer sales records, veterinary practice sales records, and self-identification processes, and may then be notified of the pendency of this action by mail or electronic mail (which can be supplemented by published notice if deemed necessary or appropriate by the Court).

98.     **Commonality and Predominance:** Common questions of law and fact exist as to all proposed members of the Class and predominate over questions affecting only individual members of the Class.  These common questions include:

a.   Whether Hill's intentionally, recklessly, or negligently authorized injurious pet food to enter the market;

b.   Whether Hill's failed to properly test its Specialty Dog Foods before placing them into the stream of commerce;

c.   When Hill's became aware of elevated levels of vitamin D in its Specialty Dog Foods;

d.   Whether the packaging and labeling of the Specialty Dog Foods deceptively represents the Specialty Dog Foods as wholesome, nutritious, and fit for canine consumption;

e.   Whether the packaging and labeling of the Specialty Dog Foods adequately discloses the significant health risks described above, including, but not limited to, dehydration, diarrhea, loss of appetite, increased thirst, lethargy, vomiting, renal failure, and death;

f.   Whether the Specialty Dog Foods are unfit for their intended use;

g.   Whether Hill's intentionally, recklessly, or negligently delayed in instituting a recall of the Specialty Dog Foods;

h.   Whether the recall is adequate and properly notifies potentially affected consumers;

i.   Whether the alleged conduct constituted unlawful, unfair, deceptive, or fraudulent business practices in violation of the state consumer protection statutes invoked below;

j.   Whether Hill's violated an implied or express warranty to Plaintiffs and the Class;

k.   Whether Plaintiff and members of the Class have sustained damages as a result of the alleged conduct, and, if so, the appropriate measure of damages; and

l.   Whether Plaintiff and members of the Class are entitled to punitive damages, and, if so, in what amount.

99.   **Typicality:** Plaintiffs' claims are typical of the claims of the proposed classes. Plaintiffs and the members of the proposed classes all purchased the Specialty Dog Foods, giving rise to substantially the same claims.

100.   **Adequacy:** Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the members of the classes they seek to represent. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and they will prosecute this action vigorously on class members' behalf.

101.   **Superiority:** A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each member of the Class, while meaningful on an individual basis, is not great enough to make the prosecution of individual

actions economically feasible. Even if members themselves could afford such individualized litigation, the court system could not. In addition to the burden and expense of managing many actions arising from this issue, individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, a class action presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

102. In the alternative, the proposed classes may be certified because:

    a. The prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Hill's;

    b. The prosecution of individual actions could result in adjudications, which, as a practical matter, would be dispositive of the interests of non-party class members or which would substantially impair their ability to protect their interests; and

    c. Hill's has acted or refused to act on grounds generally applicable to the proposed classes, thereby making appropriate final and injunctive relief with respect to the members of the proposed classes as a whole.

103. Hill's benefited from the sale of the Specialty Dog Foods to Plaintiffs and the Class in a determinable amount.

## **FIRST CAUSE OF ACTION**

**Negligence**
**(By Plaintiffs on Behalf of the Nationwide Class)**

104. Plaintiffs reallege the paragraphs above as if set forth fully herein.

105.    Defendants owed a duty to Plaintiffs and the Class to distribute, market, and sell pet food that was safe, suitable, and fit for consumption by pets.

106.    Defendants failed to exercise due care, and were negligent in, the manufacture, distribution, marketing, warranting, and sale of Specialty Dog Foods to Plaintiffs and the Class.

107.    Defendants failed to implement adequate quality control and adequate testing of the Specialty Dog Foods that it introduced into the stream of commerce for sale to Plaintiffs and the Class and for consumption by their pets.

108.    Defendants knew, or should have known, that its Specialty Dog Food presented an unreasonable and unacceptable risk of injury or death to pets, and would result in foreseeable and avoidable damage.

109.    Defendants' negligence proximately caused the losses and damages to Plaintiffs and the Class.

### SECOND CAUSE OF ACTION

**Breach of Implied Warranty**
**(By Plaintiffs on Behalf of the Nationwide Class)**

110.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

111.    Defendant is a merchant under section 2-104 and 2-314 of the Uniform Commercial Code.

112.    By means of its marketing, advertising, promotion, packaging, labeling, and sale of its Prescription Diet and Science Diet dog food, Defendant impliedly warranted that the Specialty Dog Foods were fit for the ordinary purpose for which it was intended, which was to safely nourish dogs and particularly address the specific needs of Plaintiffs' and the Class's dogs, including, but not limited to, age-specific dietary needs, breed-specific dietary needs, digestive issues, heart issues, liver issues, or kidney issues, pursuant to section 2-314 of the Uniform Commercial Code.

113.    Through its marketing, advertising, promotion, labeling, and sale, Defendant knew that Plaintiffs and the Class would purchase the Specialty Dog Foods for the ordinary purpose of providing nourishment to their dogs.

114.    Defendant manufactured, distributed, marketed, advertised, promoted, and sold its dog food for the ordinary purpose for which it was purchased by Plaintiffs and the Class.

115.    Defendant sold the Specialty Dog Foods in sealed packaging, and it was defective when it left Defendant's control.

116.    Plaintiffs and the Class relied upon Defendant's representations and warranties concerning the Specialty Dog Foods, and therefore purchased and used the food for the ordinary purpose for which it was sold.

117.    Defendant's Specialty Dog Foods purchased by Plaintiffs and the Class were unfit for their ordinary purpose when sold because they presented an unreasonable risk of illness or death to dogs.  Defendant has accordingly breached the implied warranty of merchantability by selling the unfit dog food.

118.    Plaintiffs and the Class were damaged as a proximate result of Defendant's breach of implied warranty.

**THIRD CAUSE OF ACTION**

**Breach of Express Warranty**
**(By Plaintiffs on Behalf of the Nationwide Class)**

119.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

120.    Defendant expressly warranted that the Specialty Dog Foods were suitable and safe for pet consumption.

121.    Defendant affirmatively misrepresented the qualities and benefits of the Specialty Dog Foods as detailed above.  Defendant expressly warranted the Specialty Dog Foods as

particularly healthy food tailored to the specific needs of Plaintiffs' and the Class's dogs, including, but not limited to, age-specific dietary needs, breed-specific dietary needs, digestive issues, heart issues, liver issues, or kidney issues.

122.    Hill's also promises its customers a full refund if they are not satisfied with the Specialty Dog Foods.

123.    However, the Specialty Dog Foods were not safe for dogs to consume and caused dogs to become ill and/or die.  The unsafe nature of the Specialty Dog Foods constitutes a breach of the express warranties Defendant made.

124.    The Specialty Dog Foods were sold in sealed packaging, and the defects existed when the products left Hill's control.  When it designed, manufactured, and sold the Specialty Dog Foods, Hill's knew the purpose for which the Specialty Dog Foods were intended, *i.e.*, that the Specialty Dog Foods would be consumed by dogs.

125.    Plaintiffs and the Class were induced by Defendant's marketing, advertising, promotion, and labeling of the pet food as suitable "food" to rely upon such express warranty, and, in fact, relied upon the express warranty in purchasing the Specialty Dog Foods and feeding them to their dogs.

126.    As a proximate result of the aforementioned wrongful conduct and breach, Plaintiffs and the Class have suffered damages in an amount to be proven at trial, including the cost of the Specialty Dog Foods.  Hill's has actual or constructive notice of such damages, which may fairly and reasonably be considered as arising naturally from the breach or may reasonably be supposed to have been in the contemplation of the parties at the time they made warranties as to the Specialty Dog Foods, and were the probable result of the breach of such warranties.

## FOURTH CAUSE OF ACTION

**Violation of the Magnuson-Moss Warranty Act**
**15 U.S.C. § 2301, *et seq*.**
**(By Plaintiffs on Behalf of the Nationwide Class)**

127.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

128.    Plaintiffs and the other members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301(3).

129.    Defendant is a "supplier" and "warrantor" within the meanings of 15 U.S.C. § 2301(4)-(5).

130.    Hill's Prescription Diet and Science Diet dog food products are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

131.    Defendant's written descriptions created through its marketing, advertising, promotion, packaging, and labeling of the Specialty Dog Foods, as well as the 100% satisfaction guaranty, created a "written warranty" as to the Prescription Diet and Science Diet canned dog food products.  15 U.S.C. § 2301(6).  There was also an implied warranty for the sale of such products within the meaning of the Act, as described above.  15 U.S.C. § 2301(7).

132.    For the reasons detailed above, Defendant breached this implied warranty, as the Specialty Dog Foods were not fit for their intended use and were harmful and toxic to dogs.

133.    The Specialty Dog Foods were sold in sealed packaging, and the defects alleged existed when the products left Defendant's control.

134.    Defendant's breach of implied and express warranties has deprived Plaintiffs and Class members of the benefit of their bargain.

135.    Defendant knew of the defects yet failed to remedy these breaches, damaging Plaintiffs and the Class.  In addition, any relief offered by Defendant through its recall of the Specialty Dog Foods is wholly inadequate under the circumstances.  Any requirement that

Plaintiffs resort to any informal dispute settlement procedure or afford Defendant a reasonably opportunity to cure the breach of warranties described above is excused or alternatively, has been satisfied.

136.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

137.    As a direct and proximate cause of Defendant's breach, Plaintiffs and the Class sustained damages and other losses in an amount to be determined at trial.  Plaintiffs and the other members of the Class are entitled to recover damages, specific performance, costs, attorneys' fees, and other appropriate relief.

## FIFTH CAUSE OF ACTION

**Violation of the Rhode Island Deceptive Trade Practices Act
R.I. Gen. Laws § 6-13.1-1, *et seq.*
(By Plaintiff Jubinville on Behalf of the Rhode Island Subclass)**

138.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

139.    Defendant has violated and continues to violate the Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* ("RIDTPA"), which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

140.    RIDTPA provides for a private right of action for any person who "purchases . . . goods . . . primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal" as a result of "a method, act, or practice declared unlawful by" R.I. Gen. Laws § 6-13.1-2.

141.    Defendant is a "person" within the meaning of R.I. Gen. Laws § 6-13-1.1(3).

23

142.    Plaintiff Jubinville and members of the Rhode Island Subclass are "persons" within the meaning of R.I. Gen. Laws § 6-13-1.1(3) and purchased the Specialty Dog Foods primarily for personal, family, and household purposes.

143.    Defendant's acts and practices complained of herein were performed in the course of Defendant's trade or business, including in connection with the "advertising, offering for sale, sale, or distribution of" the Specialty Dog Foods, and thus occurred in the "conduct of any trade or commerce" as defined in R.I. Gen. Laws § 6-13.1-1(5).

144.    Defendant's conduct that is "declared unlawful" by R.I. Gen. Laws § 6-13.1-2 includes:

    a.   representing that goods "have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," R.I Gen. Laws § 6-13.1-1(6)(v);

    b.   representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, R.I Gen. Laws § 6-13.1-1(6)(vii);

    c.   engaging in any act or practice that is unfair or deceptive to the consumer, R.I. Gen. Laws § 6-13.1-1(6)(xiii); and

    d.   "[u]sing any other methods, acts, or practices that mislead or deceive members of the public in a material respect," R.I. Gen. Laws § 6-13.1-1(6)(xiv).

145.    In the course of Defendant's business, Defendant manufactured, distributed, marketed, and sold the Specialty Dog Foods to the Class while misrepresenting and concealing material facts about the contents of the Specialty Dog Foods, including by mispresenting that the Specialty Dog Foods were safe for consumption, when in reality they were not fit for their intended

use and were harmful and toxic to dogs.  Defendant failed to disclose material facts concerning the Specialty Dog Foods' content at the point of sale and otherwise.

146.    Defendant also misrepresented that the Specialty Dog Foods were particularly healthy food and beneficial to the specific needs of Plaintiffs' and the Class's dogs, including, but not limited to, age-specific dietary needs, breed-specific dietary needs, digestive issues, heart issues, liver issues, or kidney issues.

147.    Defendant had exclusive knowledge of the fact that the Specialty Dog Foods were not fit for their intended purposes and were not safe for consumption.  Defendant failed to disclose these facts despite having a duty to disclose this material information to Plaintiffs and the Class.

148.    Plaintiffs and Class members were unaware of, and did not have a reasonable means of discovering, the material facts that Defendant both misrepresented and failed to disclose.

149.    A causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff Jubinville and the Rhode Island Subclass.  Had Plaintiff Jubinville and the Rhode Island Subclass known about the defective nature of the Specialty Dog Foods, they would not have purchased the Specialty Dog Foods, they would not have fed their dogs the Specialty Dog Foods, their dogs would not have suffered the resulting medical conditions or would not have died, and they would have avoided the expensive medical treatment associated therewith.

150.    As a direct, foreseeable, and proximate result of Defendant's misrepresentations, omissions, deceptive acts, and unfair practices, Plaintiff Jubinville and the members of the Rhode Island Subclass suffered actual damages by paying for the Specialty Dog Foods and paying for veterinary care and other costs arising from the illness and/or death of their dogs.  Defendant's products were worthless and thus damages are the purchase price of the products as well as the

associated veterinary and death-related costs and the value of the dogs they lost.

151.    Defendant's acts and practices were willful, knowing, and outrageous, and showed a reckless disregard of others' rights.

152.    In addition to actual damages and punitive damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to R.I Gen. Laws § 6-13.1-5.2.

## SIXTH CAUSE OF ACTION

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 ILCS § 505, *et seq*.
(By Plaintiff Sprengel on Behalf of the Illinois Subclass)**

153.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

154.    Defendant has violated and continues to violate the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505, *et. seq.*, which prohibits "unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."

155.    The Illinois Consumer Fraud and Deceptive Business Practices Act provides for a private right of action for person(s) who "suffer[ ] actual damages as a result of a violation of this Act."  815 ILCS § 505/10a.

156.    Defendant is a "person" within the meaning of 815 ILCS § 505/1(c).

157.    Plaintiff Sprengel and members of the Illinois Subclass are "persons" within the meaning of 815 ILCS § 505/1(c).

158.    Defendant's acts and practices complained of herein were performed in the course of Defendant's trade or business, including in connection with the "advertising, offering for sale, sale, or distribution of" the Specialty Dog Foods, and thus occurred in the "conduct of any trade or commerce" as defined in 815 ILCS §505/1(f).

159.    Defendant engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce by manufacturing, distributing, marketing, and selling the Specialty Dog Foods to the Class while misrepresenting and concealing material facts about the contents of the Specialty Dog Foods, including by misrepresenting that the Specialty Dog Foods were safe for consumption, when in reality they were not fit for their intended use and were harmful and toxic to dogs. Defendant failed to disclose material facts concerning the Specialty Dog Foods' content at the point of sale and otherwise.

160.    Defendant also engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce by misrepresenting that the Specialty Dog Foods were particularly healthy food and beneficial to the specific needs of Plaintiffs' and the Class's dogs including, but not limited to, age-specific dietary needs, breed-specific dietary needs, digestive issues, heart issues, liver issues, or kidney issues.

161.    Defendant had exclusive knowledge of the fact that the Specialty Dog Foods were not fit for their intended purposes and were not safe for consumption.  Defendant failed to disclose these facts despite having a duty to disclose this material information to Plaintiffs and the Class.

162.    Defendant's misrepresentations, omissions, deceptive acts, and unfair practices, as described herein, qualify as "deceptive practices" under 815 ILCS 510/2, in that Defendant, *inter alia*:

> a.  represented that the Specialty Dog Foods had "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they d[id] not have";
>
> b.  represented that the Specialty Dog Foods were of a particular standard, quality, or grade, when they were of another; and

27

c.    engaged in other conduct which similarly created a likelihood of confusion or
misunderstanding.

163.    A causal relationship exists between Defendant's unlawful conduct and the
ascertainable losses suffered by Plaintiff Sprengel and the Illinois Subclass.  Had Plaintiff Sprengel
and the Illinois Subclass known about the defective nature of the Specialty Dog Foods, they would
not have purchased the Specialty Dog Foods, they would not have fed their dogs the Specialty Dog
Foods, their dogs would not have suffered the resulting medical conditions or would not have died,
and they would have avoided the expensive medical treatment associated therewith.

164.    As a direct, foreseeable, and proximate result of Defendant's misrepresentations,
omissions, deceptive acts, and unfair practices, Plaintiff Sprengel and the members of the Illinois
Class suffered actual damages by paying for the Specialty Dog Foods and paying for veterinary
care and other costs arising from the illness and/or death of their dogs.  Defendant's products were
worthless and thus damages are the purchase price of the products as well as the associated
veterinary and death-related costs and the value of the dogs they lost.

165.    Defendant's acts and practices were willful, knowing, and outrageous, and showed
a reckless disregard of others' rights.

166.    In addition to actual and punitive damages, Plaintiffs and the Class are entitled to
declaratory and injunctive relief as well as reasonable attorney's fees and costs, and any other
damages provided by statute.

## SEVENTH CAUSE OF ACTION

**Violation of the New York General Business Law
N.Y. Gen. Bus. Law § 349, *et seq.*
(By Plaintiff Coppi on Behalf of the New York Subclass)**

167.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

168.    Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of N.Y. Gen. Bus. Law § 349(b).

169.    Plaintiff Coppi and members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

170.    The New York General Business Law provides for a private right of action for person(s) who are injured by "[d]eceptive acts or practices in the conduct of any business, trade or commerce" in the state of New York.  NY Gen. Bus. Law §§ 349(a), (h).

171.    Defendant engaged in deceptive acts and practices in the conduct of business, trade, and commerce by manufacturing, distributing, marketing, and selling the Specialty Dog Foods to the Class while misrepresenting and concealing material facts about the contents of the Specialty Dog Foods, including representing that the Specialty Dog Foods were safe for consumption and particularly healthy foods and beneficial to the specific needs of Plaintiffs' and the Class's dogs, when in reality they were harmful and toxic to dogs.

172.    Defendant had exclusive knowledge of the fact that the Specialty Dog Foods were not fit for their intended purposes and were not safe for consumption.  Defendant failed to disclose these facts despite having a duty to disclose this material information to Plaintiffs and the Class.

173.    Plaintiffs and Class members were unaware of, and did not have a reasonable means of discovering, the material facts that Defendant both misrepresented and failed to disclose.

174.    Defendant's failure to disclose material facts concerning the contents of the Specialty Dog Foods was misleading in a material respect because a reasonable consumer acting reasonably under the circumstances would have been misled by Defendant's conduct.

175.    These acts and practices were consumer-oriented because they had a broad impact on consumers at large, affecting all purchasers of the Specialty Dog Foods.

176.    As a direct and proximate result of Defendant's unlawful methods, acts, and practices, Plaintiff Coppi and the New York Subclass were injured because, among other reasons, they purchased the Specialty Dog Foods.  Had Plaintiff Coppi and the New York Subclass known about the defective nature of the Specialty Dog Foods, they would not have purchased the Specialty Dog Foods, they would not have fed their dogs the Specialty Dog Foods, their dogs would not have suffered the resulting medical conditions or would not have died, and they would have avoided the expensive medical treatment associated therewith.

177.    As a direct, foreseeable, and proximate result of Defendant's misrepresentations, omissions, deceptive acts, and practices, Plaintiff Coppi and the members of the New York Subclass suffered actual damages by paying for the Specialty Dog Foods and paying for veterinary care and other costs arising from the illness and/or death of their dogs.  Defendant's products were worthless and thus damages are the purchase price of the products as well as the associated veterinary and death-related costs and the value of the dogs they lost.

178.    Defendant's acts and practices were willful and knowing.

179.    Plaintiff Coppi and the New York Subclass are entitled to injunctive relief, recovery of actual damages or fifty dollars per violation (whichever is greater), treble damages up to one thousand dollars, and their reasonable costs and attorneys' fees.  N.Y. Gen. Bus. Law § 349(h).

180.    Any New York Subclass members who were sixty-five years of age or older at the time of Defendant's violations of N.Y. Gen. Bus. Law § 349 are entitled to pursue additional claims and remedies against Defendant pursuant to N.Y. Gen. Bus. Law § 349-c to redress Defendant's violations of N.Y. Gen. Bus. Law § 349(a) perpetrated against one or more elderly persons.

## EIGHTH CAUSE OF ACTION

**Violations of the New York General Business Law**
**NY Gen. Bus. Law § 350,** *et seq.*
**(By Plaintiff Coppi on Behalf of the New York Subclass)**

181.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

182.    Defendant has violated and continues to violate New York General Business Law § 350, which declares unlawful "false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in the state of New York.

183.    Plaintiff Coppi and members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law § 350-e.

184.    Defendant engaged in unlawful "false advertising," including in the State of New York, because its advertising was "misleading in [ ] material respect[s]."  NY Gen. Bus. Law § 350-a.

185.    In the course of Defendant's business, Defendant engaged in false advertising in the conduct of business, trade, and commerce by manufacturing, distributing, marketing, and selling the Specialty Dog Foods to the Class while misrepresenting and concealing material facts about the contents of the Specialty Dog Foods, including representing that the Specialty Dog Foods were safe for consumption and beneficial to the specific needs of Plaintiffs' and the Class's dogs, when in reality they were harmful and toxic to dogs.

186.    Defendant had exclusive knowledge of the fact that the Specialty Dog Foods were not fit for their intended purpose and were not safe for consumption.  Defendant failed to disclose these facts despite having a duty to disclose this material information to Plaintiffs and the Class.

187.    Plaintiff and the Class were unaware of, and did not have the reasonable means of discovering, the material facts that the Defendant both misrepresented and failed to disclose.

188.    Defendant's failure to disclose material facts concerning the contents of the Specialty Dog Foods, and misrepresentations concerning the efficacy and performance properties thereof, were misleading in a material respect because a reasonable consumer acting reasonably under the circumstances would have been misled by Defendant's conduct.

189.    These acts and practices were consumer-oriented because they had a broad impact on consumers at large, affecting all purchasers of Specialty Dog Foods.

190.    As a direct and proximate result of Defendant's unlawful methods, acts, and practices, Plaintiff Coppi and the New York Subclass were injured because, among other reasons, they purchased Speciality Dog Foods.  Had Plaintiff Coppi and the New York Subclass known about the defective nature of the Specialty Dog Foods, they would not have purchased the Specialty Dog Foods, they would not have fed their dogs the Specialty Dog Foods, their dogs would not have suffered the resulting medical conditions or would not have died, and they would have avoided the expensive medical treatment associated therewith.

191.    As a result of Defendant's misrepresentations, omissions, deceptive acts, and unfair practices, Plaintiff Coppi and members of the New York Subclass suffered actual damages by paying for the Specialty Dog Foods and paying for veterinary care and other costs arising from the illness and/or death of their dogs.  Defendant's products were worthless and thus damages are the purchase price of the products as well as the associated veterinary and death-related costs and the value of the dogs they lost.

192.    Defendant's acts and practices were willful and knowing.

193.    Plaintiff Coppi and the New York Subclass are entitled to injunctive relief, recovery of actual damages or five hundred dollars per violation (whichever is greater), treble damages up to ten thousand dollars, and their reasonable costs and attorneys' fees.  N.Y. Gen Bus. Law § 350-

e(3)

**NINTH CAUSE OF ACTION**

**Violation of the Texas Deceptive Trade Practices-Consumer Protection Act
Tex. Bus. & Com. § 17.41,** *et seq.*
**(By Plaintiff Freeman on Behalf of the Texas Subclass)**

194.    Plaintiffs reallege the paragraphs above as if set forth fully herein.

195.    Defendant has violated and continues to violate the Texas Deceptive Trade Practices-Consumer Protection Act ("TDTPCA"), Tex. Bus. & Com. § 17.41, et seq., which prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

196.    TDTPCA provides for a private right of action for consumers where certain enumerated actions "constitute a producing cause of economic damages or damages for mental anguish," including inter alia, "the use or employment by any person of a false, misleading, or deceptive act or practice," the breach of an express or implied warranty, and "any unconscionable action or course of action by any person."  Tex. Bus. & Com. § 17.50(a).

197.    Defendant is a "person" within the meaning of Tex. Bus. & Com. § 17.45(3).

198.    Plaintiff Freeman and members of the Texas Subclass are "consumers" within the meaning of Tex. Bus. & Com. § 17.45(3).

199.    Defendant's acts and practices complained of herein were performed in the course of Defendant's trade or business, including in connection with the "advertising, offering for sale, sale, or distribution of" the Specialty Dog Foods, and thus occurred in the "conduct of any trade or commerce" as defined in Tex. Bus. & Com. § 17.45(6).

200.    Defendant's "false, misleading or deceptive acts or practices" declared unlawful by Tex. Bus. & Com. § 17.46 include:

a. representing that goods have "have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," Tex. Bus. & Com. § 17.46(5);

b. representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, Tex. Bus. & Com. § 17.46(7); and

c. "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed," Tex. Bus. & Com. § 17.46(24).

Plaintiffs and the Class relied on these false, misleading, and deceptive acts and practices to their detriment.

201. Defendant engaged in false, misleading, and deceptive acts and practices in the conduct of business, trade, and commerce by manufacturing, distributing, marketing, and selling the Specialty Dog Foods to the Class while misrepresenting and concealing material facts about the contents of the Specialty Dog Foods, including by misrepresenting that the Specialty Dog Foods were safe for consumption, when in reality they were harmful and toxic to dogs. Defendant failed to disclose material facts concerning the Specialty Dog Foods' content at the point of sale and otherwise.

202. Defendant also misrepresented that the Specialty Dog Foods were particularly healthy food and beneficial to the specific needs of Plaintiffs' and the Class's dogs, including, but not limited to, age-specific dietary needs, breed-specific dietary needs, digestive issues, heart issues, liver issues, or kidney issues.

203.    Defendant had exclusive knowledge of the fact that the Specialty Dog Foods were not fit for their intended purposes and were not safe for consumption.  Defendant failed to disclose these facts despite having a duty to disclose this material information.

204.    Plaintiffs and Class members were unaware of, and did not have a reasonable means of discovering, the material facts that Defendant both misrepresented and failed to disclose.

205.    Defendant's conduct was unconscionable and, as alleged above, violated Defendant's express and implied warranties.

206.    As a direct, foreseeable, and proximate result of Defendant's unlawful methods, acts, and practices, Plaintiff Freeman and the Texas Subclass were injured because, among other reasons, they purchased the Specialty Dog Foods.  Had Plaintiff Freeman and the Texas Subclass known about the defective nature of the Specialty Dog Foods, they would not have purchased the Specialty Dog Foods, they would not have fed their dogs the Specialty Dog Foods, their dogs would not have suffered the resulting medical conditions or would not have died, and they would have avoided the expensive medical treatment associated therewith.

207.    As a direct, foreseeable, and proximate result of Defendant's misrepresentations, omissions, deceptive acts, and practices, Plaintiff Freeman and the members of the New York Subclass suffered actual damages by paying for the Specialty Dog Foods and paying for veterinary care and other costs arising from the illness and/or death of their dogs.  Defendant's products were worthless and thus damages are the purchase price of the products as well as the associated veterinary and death-related costs and the value of the dogs they lost.

208.    Defendant's acts and practices were willful, wanton, and knowing.

209.    In addition to actual damages, treble damages, and punitive damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and

costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the Court enter a judgment awarding the following relief:

A. An order certifying the proposed Classes, appointing Plaintiffs as representatives of the Classes, and appointing Plaintiffs' counsel to represent the Classes;

B. An order awarding Plaintiffs compensatory damages, actual damages, treble damages, punitive damages, and any other monetary relief provided by law;

C. An order awarding Plaintiffs and the Classes restitution, disgorgement, or other equitable relief as the Court deems proper;

D. An order enjoining Defendant from its unlawful conduct;

E. An order requiring Defendant to take action to ensure that all potentially affected products are identified on Hill's website and removed from shelves and that the public is adequately notified that they should not purchase and should immediately stop using the tainted food, and their dogs should be taken to a veterinarian for testing and whatever treatment is necessary.;

F. An order awarding pre-judgment and post-judgment interest as allowable by law;

G. An order awarding reasonable attorneys' fees and costs of suit, including expert witness fees, as allowable by law;

H. An order granting Plaintiffs such further and other relief as deemed just and proper by the Court.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial of all issues so triable.


Dated: February 15, 2019                                      Respectfully submitted,


   By: /s/_Fidelma L. Fitzpatrick___

Fidelma L. Fitzpatrick (#5417)
**MOTLEY RICE LLC**
55 Cedar Street, Suite 100
Providence, RI 02903
Tel: 401-457-7700
Fax: 401-457-7708
ffitzpatrick@motleyrice.com

**WEXLER WALLACE LLP**
Kenneth A. Wexler
Bethany R. Turke
Umar Sattar
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel.: (312) 346-2222
Fax: (312) 346-0022
kaw@wexlerwallace.com
brt@wexlerwallace.com
us@wexlerwallace.com

## CERTIFICATE OF SERVICE

I, Fidelma L. Fitzpatrick, hereby certify that a copy of the foregoing was electronically filed. Those attorneys who are registered with the Electronic Filing System may access these filings through the Court's System, and notice of these filings will be sent to these parties by operation of the Court's Electronic Filing System.

Dated: February 15, 2019

By: /s/_Fidelma L. Fitzpatrick___

Fidelma L. Fitzpatrick (#5417)
**MOTLEY RICE LLC**
55 Cedar Street, Suite 100
Providence, RI 02903
Tel: 401-457-7700
Fax: 401-457-7708
ffitzpatrick@motleyrice.com